FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2017 NOV 27 AM 10: 48

JEFF... R. COLWELL
CLERK

BY_____DEP. CLK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.1:17-cv-01944-GPG

EMILY BARRY,

      Plaintiff,

v.

DOUGLAS COUNTY, COLORADO;

DOUGLAS COUNTY SHERIFF, TONY G. SPURLOCK, individually and in his official capacity;

DEPUTY KEVAN CARLSON, individually and in their official capacity;

DEPUTY CHRISTY ODUM, OSN 0643, individually and in their official capacity;

DEPUTY JOHN GLASSBURNER, OSN 9848, individually and in their official capacity;

CAPTAIN KEVIN DUFFY, individually and in their official capacity;

DEPUTY SARA CLAY, OSN 1523, individually and in their official capacity;

BROCK BENTON BOWERS, individually and in their official capacity;

OFFICER SHOEMAKER, OSN 0374, individually and in their official capacity;

OFFICER PARKINSON, OSN 0549, individually and in their official capacity;

CORRECT CARE SOLUTIONS, LLC, A COLORADO LIMITED LIABILITY COMPANY;

JESSICA LEE BAKER ISAACS, RN, DIRECTOR OF NURSES, individually and in their official capacity;

KARI ANN SMITH, LPN, individually and in their official capacity;

RACHEL GRACE ZELDENRUST, RN, individually and in their official capacity;

SOPHIA NIX, LPN, individually and in their official capacity;

KESHIA LORQUET, LPN, individually and in their official capacity;

STEPHANIE CANTON, LPN, individually and in their official capacity.

"NURSE STEVIES", ASSISTANT DIRECTOR OF NURSES, individually and in their official capacity.

DR. MOSER, individually and in their official capacity;

DR. OKULEYE, individually and in their official capacity; and

JODY RAMOS, SUPERVISORY STAFF, individually and in their official capacity,

Defendants.

---

## AMENDED PLEADING/COMPLAINT AND JURY DEMAND

---

COME NOW, Plaintiff Emily Barry, allege and complain as follows:

### JURISDICTION

1.     This is a civil action for damages and attorney's fees and costs, for the violation of Plaintiff Emily Barry's civil rights.

2.     This case is brought pursuant to 18 U.S.C.A. §§ 1503, 42 U.S.C. §§ 1983, and the Second, Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States. Jurisdiction supporting Plaintiff's claims for attorney fees and costs is conferred by 42 U.S.C. §§ 1988. Jurisdiction over these claims is conferred on this Court pursuant to 28 U.S.C. §§ 1331, §§ 1343, and §§ 1367.

### VENUE

3.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All the events alleged herein occurred within the State of Colorado.

## **PARTIES**

4.      Plaintiff, EMILY BARRY, is a resident of the State of Colorado and a citizen of the United States of America, who presently resides at the following address: 9633 Kalamere Court, Highlands Ranch, Colorado 80126.

5.      At all times material hereto, Defendant, Douglas County, Colorado, is a county in the State of Colorado.  Douglas County has a non-delegable duty to provide detainees of the Douglas County Sheriff's Department and Douglas County Detention Facility; including, Ms. Barry with necessary medical care and treatment from qualified medical providers that meets a community standard of care.

6.      At all times material hereto, Defendant, Sheriff Tony G. Spurlock is a citizen of the State of Colorado and was acting as an individual and under color of state law in his capacity as Sheriff, for Douglas County, Colorado, the Douglas County Sheriff's Department, and Douglas County Detention Facility.  Sheriff Spurlock is in command with enacting, implementing and/or enforcing jail policies and procedures, and with managing, operating, and administering the jail. Sheriff Tony G. Spurlock is located at the following address:  Douglas County Sheriff's Office, 4000 Justice Way, Castle Rock, CO 80109.

7.      At all times material hereto, Defendant, Deputy Kevan Carlson, is a citizen of the State of Colorado and was acting individually and under color of state law in his capacities, respectively, for the Douglas County Sheriff's Department. Douglas County Sheriff's Department, employing Deputy Kevan Carlson, is

located at the following address: Douglas County Sheriff's Office, 4000 Justice Way, Castle Rock, CO 80109.

8.  At all times material hereto, Defendant, Deputy Christy Odum, is a citizen of the State of Colorado and was acting individually and under color of state law in his capacities, respectively, for the Douglas County Sheriff's Department and Douglas County. Christy Odum is located at the following address: Douglas County Sheriff's Office, 4000 Justice Way, Castle Rock, CO 80109.

9.  At all times material hereto, Defendant, Deputy John Glassburner, is a citizen of the State of Colorado and was acting individually and under color of state law in his capacities, respectively, for the Douglas County Sheriff's Department and Douglas County. Deputy John Glassburner is employed by the Douglas County Sheriff's Office, located at the following address: Douglas County Sheriff's Office, 4000 Justice Way, Castle Rock, CO 80109.

10. At all times material hereto, Defendant, Douglas County Detention Facility Manager, Captain Kevin Duffy, is a citizen of the State of Colorado and was acting under color of state law in his official capacity as the Leadership for the Douglas County Detentions Facility supervising and otherwise working at the Jail. Captain Duffy is in control of enacting, implementing, and/or enforcing jail policies and procedures, and with managing, operating, and administering the Douglas County Detention Facility. Defendant, Captain Kevin Duffy, is located at the Douglas County Detention Facility located at 4000 Justice Way, Castle Rock, CO 80109.

11. At all times material hereto, Defendant, Sara Clay, OSN 1523, is a citizen

of the State of Colorado and was acting individually and under color of state law in her capacities for the Douglas County Sheriff's Department, and the Douglas County Detentions Facility as an intake officer.  She is located at the following address: 4000 Justice Way, Castle Rock, Colorado 80109.

12.     At all times material hereto, Defendant, Brock Benton Bowers, is a citizen of the State of Colorado and was acting individually and under color of state law in his capacities for the Douglas County Sheriff's Department, and the Douglas County Detentions Facility.  He is located at the following address:  Douglas County Sheriff's Office, 4000 Justice Way, Castle Rock, CO 80109.

13.     At all times material hereto, Defendant, Officer Shoemaker, is a citizen of the State of Colorado and was acting individually and under color of state law in his capacities, respectively, for the Douglas County Sheriff's Department and Douglas County Detentions Facility.  He is located at the following address: Douglas County Sheriff's Office, 4000 Justice Way, Castle Rock, CO 80109.

14.     At all times material hereto, Defendant, Officer Parkinson, is a citizen of the State of Colorado and was acting individually and under color of state law in her capacities, respectively, for the Douglas County Sheriff's Department and Douglas County Detentions Facility.  She is located at the following address: Douglas County Sheriff's Office, 4000 Justice Way, Castle Rock, CO 80109.

15.     At all times material hereto, Defendant, Correct Care Solutions, LLC, and their agents servants and employees including Jessica Isaacs, RN, 'Nurse Stevies', Kari Smith, LPN, Rachel Zeldenrust, RN, Sophia Nix, LPN, Keshia Lorquet, LPN, Kari Smith, LPN, Stephanie Canton, LPN, Dr. Moser, Dr. Okuleye and

Jody Ramos ("Defendants Correct Care Solutions, LLC") are citizens of the United States and residents of Colorado and were acting under color of state law in their official capacities as contracted employees of Douglas County, Colorado, and the Douglas County Sheriff's Department supervising and otherwise working at the Jail managing and providing care for inmates while at the Douglas County Detention Facility. Correct Care Solutions, LLC, (CCS) is a private, for profit Corporation registered in to do business in the State of Colorado. Correct Care Solutions current principle place of business is located at the following address: Corporate Creations Network Inc., 1283 Murfreesboro Pike, Ste 500, Nashville, CO 37217. At all times material hereto, Defendant, Correct Care Solutions, LLC, (CCS), and the Defendant's staff and contracted employees were acting within the course of their employment and acting under color of state law.

16.     At all times material hereto, Defendant, Jessica Lee Baker Isaacs, is a citizen of the State of Colorado and was acting individually as a Registered Nurse, and, respectively, as a Supervising Registered Nurse with the Douglas County Sheriff's Department and Douglas County Detentions Facility within the course of her employment and acting under color of state law. She is currently employed by Southwest Correctional Medical Group located at the following address: Douglas County Detentions Facility, 4000 Justice Way, Castle Rock, CO 80109.

17.     At all times material hereto, Defendant, Kari Ann Smith, is a citizen of the State of Colorado and was acting individually as a PN, respectively, for the Douglas County Sheriff's Department and Douglas County Detentions Facility within the course of her employment and acting under color of state law. She is

currently employed by Correct Care Solutions at the Arapahoe County Sheriff's Office located at 7375 S. Potomac St, Centennial, CO 80112. Her individual location is as follows: 2334 Beacham Drive, Castle Rock, CO 80104, with a phone number of 719-291-7302.

18. At all times material hereto, Defendant, Rachel Grace Zeldenrust, RN, individually and in their official capacity with the Douglas County Sheriff's Department and the Douglas County Detentions Facility within the course of her employment and acting under color of state law. She is currently employed at University of Colorado Hospital located at 1635 Aurora Ct, Aurora, CO 80045, Phone Number is (720) 848-7579.

19. At all times material hereto, Defendant, Sophia Helene Nix, LPN, individually and in their official capacity with the Douglas County Sheriff's Department and the Douglas County Detentions Facility within the course of her employment and acting under color of state law. She is currently employed with Corrective Care Solutions at the Arapahoe County Detention Facility located at 7375 S. Potomac St, Centennial, CO 80112, Phone No. (720)874-3500 and at the Douglas County Detentions Facility located at 4000 Justice Way, Castle Rock, CO 80109, Phone No. (303)660-7565.

20. At all times material hereto, Defendant, Keshia Lorquet, PN, individually and in their official capacity with the Douglas County Sheriff's Department and the Douglas County Detentions Facility within the course of her employment and acting under color of state law. She is currently employed at BrightStar Care Home Care and Medical Staffing located at 3801 E Florida Ave, Suite 502 in

Denver, CO 80210, Phone Number (303)300-6666.

21.      At all times material hereto, Defendant, Stephanie Renee Canton, LPN, individually and in their official capacity with the Corrective Care Solutions, Douglas County Sheriff's Department and the Douglas County Detentions Facility within the course of her employment and acting under color of state law. Stephanie Canton is currently an unregistered LPN working at Cedarwood Health Care Center located at 924 W Kiowa St, Colorado Springs, CO 80905, Phone Number (719)636-5221 and Garden of the Gods Care Center located at 104 Lois Lane, Colorado Springs, CO 80904, Phone Number (719)635-2589.

22.      At all times material hereto, Defendant, "Stevies", (legal name was denied being given to Plaintiff by Sergeant Staples, Captain Duffy, and Lt. Rotherheim of the Douglas County Sheriff's Department; therefore; licensing cannot be verified) individually and in their official capacity with the Corrective Care Solutions, Douglas County Sheriff's Department and the Douglas County Detentions Facility within the course of her employment as the Director of Nurses and as an alleged Registered Nurse and acting under color of state law. "Nurse Stevies" is not currently nor has ever been a registered nurse in the State of Colorado, but is working as a registered nurse and currently works at the Douglas County Detentions Facility located at 4000 Justice Way in Castle Rock, Colorado.

23.      At all times material hereto, Defendant, Timothy G. Moser, MD, individually and in their official capacity with the Corrective Care Solutions, Douglas County Sheriff's Department and the Douglas County Detentions Facility, acting within the scope of his employment and acting under color of state

law, is a medical doctor of Family Medicine, and oversees ensuring the physical health of all inmates at the Douglas County Detentions Facility. Dr. Timothy Moser's medical practice is located at 2110 Osceola Street in Denver, CO 80212, and has a telephone number of (720) 440-4004.

24.     At all times material hereto, Defendant, Dr. Babatunde Gbolade Okuleye, individually and in their official capacity as a Doctor of Psychiatry with Corrective Care Solutions, Douglas County Sheriff's Department and the Douglas County Detentions Facility within the course of his employment with CCS, and acting under color of state law. Dr. Okuleye currently operates as an independent contractor as a Medical Doctor specializing in Psychiatry for Corrective Care Solutions LLC located at 1283 Murfreesboro Road, Suite 500, Nashville, TN 37217, with a contact telephone number of (773) 350-0020.

25.     At all times material hereto, Defendant, Jody Lynn Ramos, RN, individually and in their official capacity as medical supervisory staff with the Corrective Care Solutions, Douglas County Sheriff's Department and the Douglas County Detentions Facility within the course of her employment and acting under color of state law. Defendant, Jody Lynn Ramos is currently is employed by Bonaventure Senior Living at 1244 East Cordera Parkway in Colorado Springs, Colorado 80139, telephone number (719)434-5230. Jody Lynn Ramos home address is 2866 East Florida Avenue, Aurora, Colorado, telephone number (720) 514-1228.

## CASE BACKGROUND AND FACTUAL ALLEGATIONS

26.     On or about August 14, 2015, Emily Barry called 911, connecting her to the Douglas County Dispatch to respond to a breaking and entering at her residence where she resided with her mother and father.  The property is owned by her mother, Julia Barry, and is located at 9633 Kalamere Court in Highlands Ranch, Colorado in unincorporated Douglas County, Colorado.

27.     On or about August 6, 2015, the Plaintiff's Residence was broken into by one of the male intruders who returned on August 14, 2015, with another property.  The Douglas County Sheriff's Office was contacted immediately at the time of this burglary, but failed to respond for almost an hour.  The responding Deputy did not file a report or pursue any other actions, including any investigation stating he was unable to do anything without information, specifically the name of the suspect.  On or about August 6, 2015, the suspect broke into the Plaintiff's secured fenced in and locked backyard, then the locked and secured basement of her residence prior to stealing an estimated $5,000 of tools and equipment from the Plaintiff's residence which included property left by contractors hired to do work at the residence; defecating in the back yard next to the basement door; and verbally threatening the Plaintiff and her mother, Julia Barry, who owns the property.

28.     On or about August 14, 2015, subsequent to an unreasonable delay in response time without cause the Plaintiff's residence of approximately 23 minutes prior to any employee or agent of the Douglas County Sheriff's Department

beginning their response to the Plaintiff's residence, and as the Plaintiff believed the breaking and entering to be continuing based on her ability to see home surveillance footage in her basement and around her property, and having seen via surveillance footage that one of the armed male intruders assaulted the Plaintiffs livestock in her secured backyard, and her dog while in the basement of her home; the Plaintiff obtained a legally owned and possessed weapon stored inside her residence and confronted the aggressors where the Plaintiff verbally demanded that they both leave her residence immediately or she would be forced to fire her weapon in defense of herself and property. The Plaintiff also stated that she had already contacted law enforcement and they would be arriving any minute in an attempt to enhance the chances of the perpetrators leaving her property, despite her personal knowledge that law enforcement's response time to the scene at the point was unknown and unpredictable. At no time during the confrontation between the Plaintiff and the armed male perpetrators did the Plaintiff ever point her weapon at the either of the perpetrators, nor did the Plaintiff threaten to kill either of them, despite clearly articulated threats of physical harm expressed both verbally and physically by the intruders depicting their intention to harm the Plaintiff, with a clearly communicated intention of the harm they intended to inflict against the Plaintiff resulting in the Plaintiff's death, and further harm to her property.

29.     Following the arrival of the Douglas County Sheriff's Deputies, over 23 minutes following the Plaintiff's call for help, and only after being dispatched to the property following a call from one of the armed male intruders after they were

informed by the Plaintiff that she had already contacted law enforcement for emergent law enforcement assistance, did and dispatched Deputies arrive on scene at 9633 Kalamere Court in Highlands Ranch, Colorado 80126.

30.     If Douglas County Sheriff Deputies responded in a timely manner to the Plaintiffs 911 call for emergent law enforcement assistance, the Plaintiff would not have been forced to utilize her weapon in defense of herself and her property. By arresting the Plaintiff for the crime of Felony Menacing, the Plaintiff's freedom and right to protect herself and her property was violated, consequently violating the Plaintiff's Second and Fourth Amendment Rights Secured under the Constitution of the United States of America. "The affirmative duty to protect arises not from the States knowledge of the individual's predicament or from its expression of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf" (DeShaney v. Winnebago County Department of Social Services, 109 S. Ct: 998 (1989) at 1006).

31.     The responding Douglas County Sheriff's Office Deputies included Deputy Kevan Carlson, Deputy John Glassburner, and Deputy Christy Odum. The responding Deputies refused to take a complaint of the breaking and entering, theft of personal property, and damages to her mother's real property after arriving on scene. They also refused to take a complaint for the threat of violence against Ms. Barry; and, the assault of her baby livestock and canine which resulted in a need of veterinary medical care for the injured livestock resulting in the chicken's permanent injury in loss of egg production and stunted growth, and close supervision with a potential need of emergent medical care for her canine.

By refusing to provide the Plaintiff with protection for herself, family, and property, the Douglas County Deputies violated the Plaintiff's rights guaranteed under the Fourteenth Amendment of the Constitution of the United States of America.

32.     Deputy John Glassburner entered the Plaintiff's residence without warrant and lacking permission from the Plaintiff, home owner, and/or other resident, Garret Barry.  During his time inside the Plaintiff's residence he ran a number of legally owned firearms within the residence through the Douglas County Sheriff's Department intentionally looking for a firearm registered to the Plaintiff to seize. Deputy Glassburner subsequently seized the only firearm which was registered to the Plaintiff in the State of Colorado despite the fact that this was not the weapon the Plaintiff had in her hand holding at the side of her persons when she confronted the two perpetrators, as the firearm she had at her side during the confrontation was purchased and registered in the State of Florida, where the Plaintiff resided for work for several years after college.  This seizure was completed regardless of the affirmative defense legally secured to the Plaintiff by State and Federal Law; thereby, violating the Plaintiff's rights under the Second, Fourth, and Fourteenth Amendment of the Constitutional of the United States of America.

33.     The Plaintiff, Emily Barry, subsequently gave limited access of her residence to Deputy Carlson.  The limited access was granted to Deputy Carlson with the clearly communicated understanding it was for the sole purpose for him to finish his write up and interview of the Plaintiff and her family inside due to

poor weather conditions. At this time Deputy Carlson was allowed access to the home surveillance recordings at the Plaintiff's Residence; however, he chose not to review any of the surveillance footage.

34.     Upon the entry to the residence by the Plaintiff, her mother, father, and Deputy Carlson; Deputy John Glassburner and Deputy Christy Odum subsequently gave both perpetrators access to the basement of the Plaintiff's residence and allowed them to take thousands of dollars of additional tools, equipment, and other personal property belonging to the Plaintiff and her family while Deputy Glassburner stood at the side of the Plaintiff's residence playing on his cell phone and not paying any attention to the perpetrators and what they were taking from the Plaintiff's residence. The Deputies actions resulted in a financial loss of over $59,400 to the Plaintiff and her parents due the theft of property, and the damage to the Plaintiff's property by the Perpetrators.

        At the time this occurred, the Plaintiff, and her parents were informed by Deputy Carlson that one of the perpetrators was already in custody for violation of restraining order, and the other was detained for questioning, despite at the time this theft of personal property and additional property damage was occurring inside and in the secured backyard of the Plaintiff's residence. The Deputies acts were in a clear violation of the Plaintiff's Fourteenth Amendment Rights Under the Constitution of the United States of America.

35.     Inside the residence, Deputy Carlson was clearly becoming incensed with the Plaintiff inside the Plaintiff's home due to the Plaintiff's refusal to include false statements related to her actions in defense of herself and property on or

about August 14, 2015, despite his numerous demands for her to do so, stating that "the only way they could take any action against either of the perpetrators was if the Plaintiff wrote in her statement that she pointed her weapon directly at both perpetrators". Deputy Carlson violated 18 U.S.C.A. §§ 1503, which states that a person who "corruptly or by threats of force, or by threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice" is guilty of the crime of obstruction of justice. Deputy Carlson failed to act honestly with the Plaintiff and intentionally placed her in a state of fear of reprisals through stating her would place her and her family in a dangerous situation if she failed to make false statements in her written statement.

Deputy Carlson stated to the Plaintiff, in the presence of Deputy Glassburner, and both of her parents, that if the Plaintiff refused to include in her statement that she pointed a gun directly at both perpetrators and threatened to kill both perpetrators, that he could not legally pursue any charges against the perpetrators, nor execute a probable cause arrest for their crimes against the Plaintiff, and her property. Despite repeated questioning by the Plaintiff to both Deputies concerning the logic of the need for the Plaintiff to include a knowingly false statement, the Plaintiff nor her family were ever given a response. Due to the Plaintiff's state of poor health on or about August 14, 2015, the Plaintiff finally agreed to state that she pointed her weapon in their general vicinity under the terms of the verbal agreement with Deputy Carlson and Deputy Glassburner that if the Plaintiff included this in her written statement, that this would be what

the Douglas County Sheriff's Department needed to take action against both perpetrators and protect the Plaintiff, her family, and property on and subsequently to August 14, 2015, from the perpetrators.

36.     While inside the Plaintiff's residence, Deputy Carlson, executed the arrest of the Plaintiff without warrant and/or exigent circumstances. The arrest was affected under alleged probably cause obtained using case narratives written subsequent the Plaintiff's arrest that included a number of material misstatements of fact in a manner which meets the criteria for the basis of the impeachment of specific Sheriff Department Personnel, including, but not limited to: Deputy Kevan Carlson, Deputy Christy Odum, and Deputy John Glassburner. Additionally, the arrest of the Plaintiff took place inside her home, which entrance was not permitted to the Deputies for the reason of effecting an arrest on the Plaintiff. The Plaintiff was also not read her Miranda Rights, told what she was being charged with, or under what authority Deputy Carlson was arresting the Plaintiff, when the Plaintiff was arrested inside her home. This violated the Plaintiff's constitutional rights guaranteed her under the fourth and fourteenth amendment of the Constitution of the United States of America.

37.     At the time of the Plaintiff's arrest, the Plaintiff and her family advised Douglas County Sheriff's Deputies Kevan Carlson, Christy Odum, and John Glassburner of her serious medical conditions which at the time prevented the Plaintiff from leaving her home due to the high risk of infection since she had no immune system at the time of her arrest and was in a state that the medical doctors at the time to be chronic sepsis, which she had recently been hospitalized for. The

Plaintiffs health issues that were discussed with the three Deputies included immunodeficiency (which requires regular immunoglobulin (antibodies made from plasma), a potential for one or two IVIG infusions to reboot the Plaintiff's immune system, angioedema or severe swelling of a part or multiple parts of the body. (Ex. 1, Letter from Igor Huzika, MD), in addition to her past history of numerous traumatic brain injuries which the Douglas County Sheriff's Office was well aware of and at the time of her arrival at the jail even had a full sheet, double sided of information related to the Plaintiff's prior Traumatic Brain Injuries, which included the Plaintiffs medications, doctor notes, and other misc. therapies used as part of her treatment for the Traumatic Brain Injuries suffered in Douglas County in 2006, and was last updated a day prior to a court hearing regarding the defendant in that case for violation of his terms of parole for the third time in 2014.

38.     The Plaintiff did not pose a threat to herself or others at the time of unlawful arrest. Prior to her arrest she had been hospitalized for a serious attack which resulted in what Doctor's at the time believed to be Chronis Sepsis. The Plaintiff had a severe generalized edema resulting in an initial weight gain of approximately 133lbs in 3 days approximately two weeks prior to the Plaintiff's arrest on or about August 14, 2015. This edema was easily physically recognizable by any competent person without any medical training. Deputies, despite the gruesome appearance of the Plaintiff which included a very limited ability to see the Plaintiff's facial features; including her mouth and eyes, and including a bright red appearance on her entire body, remained indifferent to her

serious medical condition. Additionally, all Deputies were verbally, and in-writing informed of the Plaintiff's serious medical condition by the Plaintiff, and both her mother and father, which included a complete failure of her immune system requiring her to not leave her residence due to risk of germ exposure and limited access for others entering the residence.

Deputies Kevan Carlson and John Glassburner showed willful neglect in their discretion to arrest the Plaintiff rather than issue a summons to appear based on the health status of the Plaintiff, in addition to the Plaintiff never being in trouble with the law previously, with the exception of a couple of minor traffic violations more than 5 years prior to this incident *which were promptly handled by the Plaintiff); providing no cause to believe that the Plaintiff was a threat to the safety of the public, thereby; violating the Plaintiff's Fourth and Fourteenth Amendment rights of the Constitution of the United State of America: "failure to obtain arrest warrant justified whenever circumstances require immediate action to protect the public safety" (People c. Cardenas, 42 Colo. App. 61,592 P.2d 419 (1978)). "Rather probable cause deals with probabilities which are not technical, but rather the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (Gonzales v. People, 156 Colo. 252, 398 P.2d People, 159 Colo. 223, 411 P.2d 328 (1966); People v. Bueno, 173 Colo. 69, 475 P.2d 702 (1970); People v. Clark, 173 Colo. 129, 476 P.2d 564 (1970); People v. Weinert, 174 Colo. 71, 482 P.2d 103 (1971); People v Saars, 196 Colo. 294; 584 P.2d 622 (1978)).

39.     The National Conference of State Legislatures state that a custodial arrest is

to be made when one or more of the following conditions exist: 1) There are reasonable grounds to believe the person will not appear in court, or the person has previously failed to appear; 2) There are reasonable ground to believe the person poses a danger to persons or property, or that the offence will continue; 3) The person has outstanding warrants; 4) A legitimate investigation or prosecution would be jeopardized by release; 4) The person requires physical or mental health care due to intoxication; 5) The individual refuses to sign a written promise to appear or requests to be taken before a judge; and 6) The person does not have or will not provide valid identification, or the provided identification cannot be verified and the person is unwilling to provide fingerprints.

None of the above factors applied to the Plaintiff, and based on other arrest made by the Douglas County Sheriff's Office Deputies in the months surrounding the Plaintiff's unlawful arrest, it is subsequently clear that arresting individuals based rather than issuing a citation, when Deputies believe a crime may have been committed without any affirmative defense that arresting individuals is part of an official policy or custom of the Douglas County Sheriff's Office. *Monell v. Department of Social Security* 436 U.S. at 691 (1978).

40.     Based on information known by the Plaintiff, her family, and through research of similar arrests, tt is a logical belief that the Douglas County Sheriff's Department arrest individuals who they believe have the financial means to pay a cash bond, and at the time of arrest are presumed to not be held in custody, which would cause an unnecessary expense for the County through higher expenses of the Douglas County Sheriff Department, and Detention Facility.

At the time of the Plaintiff's arrest by Deputy Kevan Carlson under the instruction of his superior, Deputy Glassburner, both Deputies stated the Plaintiff's parents could bond her out for $500 cash within 1-2 hours of her arrest. When Deputy Carlson was told by jail staff members that the Plaintiff needed to be taken to the closest emergency room for medical clearance, Deputy Carlson's demeanor changed significantly, and he expressed verbally to the Plaintiff while in the patrol car 'that he didn't have time for this and it defeated his purpose of effecting the arrest of the Plaintiff'.

41.     On the way to the Detention Facility, Deputy Carlson was informed by Detention Center Personnel that he needed to take the Plaintiff to the closest Emergency Room for medical clearance before bringing the Plaintiff to the Detention Facility to be booked. At this time, Deputy Carlson asked the Plaintiff the status and type of her medical insurance, and the Plaintiff responded to Deputy Carlson that she had a PPO Policy through UnitedHealth Care. The status of the Plaintiff's medical insurance should not have been a factor or even asked to be provided by the Deputy. It was clear that the Deputy's intention for asking was to ensure that the arrest of the Plaintiff would still be beneficial for him.

Despite being told this information for a need to take the Plaintiff to the closest hospital just minutes after leaving the Plaintiff's residence, Deputy Carlson took the Plaintiff, Emily Barry, to Castle Rock Adventists Hospital, to be medically cleared after the Detention Facility Staff confirmed with personnel at Little Adventists Hospital that the Plaintiff was in fact recently discharged from their care with what they believed to be at the time was Chronic Sepsis, which

resulted in severe generalized brawny edema, and hypergammaglobulinemia (failure of the Plaintiff's immune system caused by vacuolated white blood cell morphology: this means that the Plaintiff was producing a large quantity of white blood cells at a rapid rate which did not allow for the white blood cells to form completely which is required to for them to prevent infections and/or viruses).

Castle Rock Adventist Hospital is 30 Minutes away from the Plaintiff's residence, and the 8th farthest Hospital Emergency Room from the location of Deputy Carlson when he was informed of the necessity of medical clearance. It is a common policy and/or custom by Douglas County Leadership and staff to take inmates to Castle Rock Adventists Hospital rather than the closest Hospital, as he was instructed to do, because the Douglas County Sheriff's Office staff/agents have a special relationship with the staff at Castle Rock Adventists Hospital. Subsequent to the Plaintiff's visit to the emergency room at Castle Rock Adventists Hospital, her health insurance was billed over $1,500, and she was personally held liable for paying a $250 ER Co-payment to the hospital.

42.     After exiting Deputy Carlson's patrol car to walk inside the emergency room at Castle Rock Adventists Hospital, Deputy Carlson removed the handcuffs from the Plaintiff, and walked in front of her approximately 5 to 10 feet until they entered the hospital emergency room and were in a medical exam room. Deputy Carlson's behavior entering the Emergency Room at Castle Rock Adventists Hospital clearly shows that he did not believe the Plaintiff to be a danger to him, herself, or the public; nor did he believe the Plaintiff to be a flight risk. Deputy Carlson, upon request by a emergency room staff member in charge of security

loosely handcuffed one of the Plaintiff's wrist to the bed. The Plaintiff was contacted by a registered nurse who verified all the Plaintiff's medications and medical conditions, ensured the Deputy had all the Plaintiff's correct medication in his possession from her home, then took the Plaintiff's vitals. While the registered nurse at the emergency room was still with the Plaintiff, a billing administrator came in to confirm the Plaintiff's medical insurance and obtain a signature from her to provide care and bill her insurance. The Plaintiff was hesitant to sign this form because the emergency room visit; therefore, the billing administrator interrupted Deputy Carlson from his conversation with emergency room security in the hallway to come into the Plaintiff's treatment room, at which time he stated to the Plaintiff that she needed to sign the form, but the Plaintiff's insurance would be billed for the visit, but the Plaintiff would not be responsible for the co-pay/deductible portions of the visit as the Douglas County Sheriff's Office would be financially responsible for all of the out of pocket costs.

Following this, Deputy Carlson left the Plaintiff at the hospital emergency room for well over an hour while he met, who he told the Plaintiff was a friend, for dinner. When Deputy Carlson returned to the emergency room at Castle Rock Adventist Hospital he asked the security guard if I was ready to go yet, and she clearly stated to him that Ms. Barry had not yet been seen by a Medical Doctor or Nurse Practitioner. Additionally, the Plaintiff also informed Deputy Carlson that she had not been seen by a medical doctor or nurse practitioner, and that she had not been discharged yet, to her knowledge.

Ignoring this information, Deputy Carlson located the registered nurse

who took the Plaintiff's vitals and verified her medications upon arrival and asked her to discharge the Plaintiff from the hospital because his shift had already ended for the day. Deputy Carlson signed the Plaintiff's discharge paperwork as the legal guardian of the Plaintiff, and the Plaintiff was not allowed to speak with the nurse, or any other staff, nor see her discharge paperwork.

Through Deputy Carlson's actions, he failed in his duties to ensure the Plaintiff was medically cleared by a medical doctor before she was brought to the detention facility and booked into custody on or about August 14, 2015.

43.     Deputy Kevan Carlson failed to bring any medical clearance paperwork with him to the jail. The Supervisory Nurse who checked the Plaintiff's health prior to being brought into the booking area, Jody Ramos, normally worked at the Arapahoe County Detention Facility, and was working at the Douglas Detention Facility on or about August 14, 2015, because two nurses had called in sick for the shift she was working.

Nurse Ramos was concerned for the health of Ms. Barry due to the appearance and obvious complicated health issues of Ms. Barry; therefore, she contacted Castle Rock Adventists Hospital, and Sgt. Brock Bowers by telephone, leaving messages for them to call her back immediately, stating in her message to Sgt. Bowers that Ms. Barry had not been medically cleared properly, and in her opinion, the Plaintiff should not be booked into custody, but rather be issued a citation and be brought back to her residence or the hospital for further medical care. Jody Ramos, RN, also asked Deputy Carlson for Ms. Barry's medications as she understood the importance of Ms. Barry receiving her medications in a

timely manner and was notified by the Plaintiff that her medications were due. Deputy Carlson had left the Plaintiff's medications in his patrol car, and told Jody Ramos that he would get them shortly. At this time, Jody Ramos, told the Plaintiff that she would receive all prescribed medications while at the jail, regardless of the medication type, until she underwent a full physical by their medical doctor, but she was not sure at that time who the medical doctor was for the Douglas County Detention Facility.

Prior to receiving the Plaintiff's medications or calls back from the parties Ramos contacted to speak with about the medical state of the Plaintiff, Jody Ramos, was called to assist in a medical emergency in another location at the jail, but told Deputy Carlson to not take the Plaintiff to booking until she was back and had a chance to speak with the hospital, Ms. Barry's medical doctor, and Sgt. Bowers. While Jody Ramos was still outside of the pre-booking area handling the care of another inmate in the detention facility, Deputy Carlson cleared Ms. Barry for booking into the jail, and Ms. Barry was taking through X-ray to the booking area. Nurse Ramos, despite Ms. Barry being taken through to the Booking area of the Detention Facility failed in her duties as the gate keeper medically on duty at the Douglas County Detentions Facility to follow-up on Ms. Barry health, provide her medications, etc.

Ms. Barry was given a form stating her rights which Deputy Carlson demanded she sign, however; the charge which she was being arrested for was blank at this time. Ms. Barry has severe Hippus (rapid dilation spasms of the pupil) resulting in significant visual impairment, and she had requested Deputy

Carlson and Officer Clay to assist her in reading the form she was signing and again asked Deputy Carlson the charge she was being arrested for. Neither Deputy Carlson or Deputy Clay was willing to assist the Plaintiff in reading the document and neither was able to tell the Plaintiff the charge which she was being arrested for. The Plaintiff stated that she was not comfortable signing the form until she understood it in full, but Deputy Carlson raised his voice towards the Plaintiff demanding she sign the form immediately. Due to the intimidation of the Plaintiff by Deputy Carlson, the Plaintiff signed the form while Deputy Carlson used his fingers to highlight the area which the Plaintiff needed to sign since the Plaintiff was unable to see it. Subsequently, the Plaintiff was taken through an x-ray machine and moved into the booking area.

44.    In the pre-booking area of the Douglas County Detention Facility, after Deputy Carlson had submitted several different versions of the probable cause arrest affidavit, Kevan Carlson, was becoming more displeased with effecting the arrest stating to another officer in the Detention Facility pre-booking room that the Plaintiff's arrest was intended to be a fast cash bond and has turned into a bigger deal than he expected, and was told by his supervisor, Deputy Glassburner, told him it would be.

Co-Defendant in this case, Broke Benton Bowers, the Sergeant who signed off on the Plaintiff's probably cause arrest. Sgt. Bowers made contact with Deputy Carlson numerous times by telephone depicting all the changes that were required to justify the Plaintiff's arrest, resulting in several amendments to the arresting Deputies sworn statement. On Deputy Carlson's first phone call with

Sgt. Bowers, Deputy Carlson was asked to provide Sgt. Bowers with the names of the Plaintiff's parents, which Deputy Carlson gave to him verbally by telephone. Sgt. Bowers called Deputy Carlson back in the pre-booking area a few minutes after being told the Plaintiff's parents name and instructed Deputy Kevan Carlson to further amend his narrative to justify the Plaintiff arrested for a Felony rather than a Misdemeanor. It is believed the charge was altered due to the belief that the Plaintiff's family could afford to pay a larger cash bond on or about August 14, 2015. The actions due to the custom and policies of the Douglas County Sheriff's Office violated the Plaintiff's fourth, eighth, and fourteenth amendment rights.

Unfortunately, the Plaintiff's family was not in a financial situation where they could place a bond of $50,000, despite the belief of Sgt Bowers that the Plaintiff's family was in a position to easily pay such a large bond on the Plaintiff's behalf. Consequently, the Plaintiff's family contacted a criminal attorney, Christopher Decker, and retained his services utilizing all funds which the Plaintiff's family could put together at the time, approximately $5,500. The Plaintiff's family also contacted Ms. Barry's medical doctors, and the Douglas County Detention Facility booking staff on duty and medical staff; speaking with Deputy Sara Clay and Officer Shoemaker in booking and leaving numerous messages for the facilities medical staff on or about August 14, 2017, in attempts to ensure that the Plaintiff's medical situation and her extensive medical needs were understood, and she was receiving her medically necessary medications and medical care while incarcerated, in addition to the staff being aware of the serious

and deadly complications which could occur at any time to the Plaintiff, especially when under any form of stress, which occurred in the events at Ms. Barry's residence and they feared would occur during her incarceration.

Emotional trauma's, and elevations in emotional stress have been proven factors in significant increases in the occurrence and severity of medical complications to individuals with chronic health conditions of any type, but especially individuals with autoimmune and/or autoinflammatory conditions. Therefore, it is vital to the Plaintiff's health to avoid all situations and individuals which could/would potentially cause any form of stress to the Plaintiff. It had been noted in the Plaintiff's medical record that even the simplest act of an individual raising their voice to another individual in the presence of the Plaintiff was enough to result in health complications to the Plaintiff; therefore, the Plaintiff's family wanted to ensure that the Detention Facility Staff was aware of this, and the most likely and most severe complications that could potentially occur during the Plaintiff's incarceration.

Officer Shoemaker, Deputy Clay, in addition to Deputy Odum, Deputy Glassburner, and Deputy Carlson were all made aware of these issues either at the of the Deputies arrival at the Plaintiff's residence, at the time of the Plaintiff's arrest, and before and after the Plaintiff's arrival to the Douglas County Detention Facility on or about August 14, 2015. However, through Policy and Custom of the leadership and staff of the Douglas County Sheriff's Department, and the Douglas County Detention Facility, it is not uncommon for them to ignore information like this specifically as it relates to inmates under their care. Ignoring

this information resulted in the Defendants inflicting unnecessary cruel and unusual punishment on the Plaintiff, and violating the Plaintiff's rights under the 4th, 8th, and 18th Constitutional Amendments of the United States of America, and the Plaintiff's rights pursuant to 42 U.S.C. §§ 1983.

45.        While being booked into the jail Ms. Barry asked Deputy Carlson numerous times for what she was being charged with.  Finally, as Ms. Barry was entering the booking area of the jail Deputy Kevan Carlson stated that if the Plaintiff shot and killed the two male perpetrators then no crime would have been committed, however; because Ms. Barry did not fire her weapon injuring either of the armed male perpetrators, no affirmative defense could be applied to her having a firearm in her hand to her side at her residence when she was forced to confront the two armed male intruders due to a lengthy delay of 23 minutes until the arrival of the first Deputy at the Plaintiff's residence.

This statement and the subsequent behavior of Deputy Carlson further shows an intention to violate the Plaintiff's rights under the Second Amendment of the Constitution of the United States stemming from the policy and customs of the Douglas County Sheriff's Department and the Agenda set forth by Assistant District Attorney of the 18th Judicial District, in charge of all cases in Douglas County in collaboration with the Sheriff's Department.

The belief that the Assistant District Attorney of the 18th Judicial District was involved in culminating this policy and custom with the Douglas County Sheriff's Office Leadership stems from his prior media interviews and clearly stated agenda as the elected District Attorney of Jefferson County which resulted

in a record high of wrongful arrest related to firearm possession and usage. Media interviews confirm his agenda to be the same when he was hired by the elected District Attorney of the 18th Judicial District.

46.     Officer Parkinson's, on or about the morning of August 15, 2017, performed an unlawful strip search of the Plaintiff, Ms. Barry, pursuant to CO Rev Stat §16-3-405, which; states that a reasonable belief that the individual is concealing a weapon or controlled substance must exist if a strip search is conducted prior to arraignment, and the individual is not a parolee or an offender serving a sentence in any correctional facility in the state or that the individual is arrested for driving while under the influence of drugs.

Strip searches pursuant to CO Rev Stat §16-3-405 also state that every peace officer or employee of a police department or sheriff's department conducting a strip search shall obtain the written permission of the police commander or an agent thereof or a sheriff or an agent thereof designated for the purpose of authorizing a strip search in accordance with the law.  Permission from the property Sheriff's Department Authority was not obtained to the Plaintiff's knowledge, based on the paperwork released to the Plaintiff by and through the Douglas County Sheriff's Office regarding the Plaintiff's arrests, incarceration, and subsequent criminal investigations/proceedings.

Additionally, the search must be performed under sanitary conditions and conducted by a licensed physician or nurse.  Officer Parkinson is not a licensed physician or nurse.  The only time that these rules can legally be waived under C.R.S. § 16-3-405 is following arraignment and pursuant to a court order, the

individual is taken into custody by or remanded to a sheriff or a correctional facility, which did not apply to Ms. Barry at the time the strip search was conducted on her by Officer Parkinson's

Colorado State Law additionally states that "Any peace officer or employee of a police department or a sheriff's department who knowingly or intentionally fails to comply with any provision of this section commits second degree official misconduct, as defined in section 18-8-405, C.R.S. Nothing contained in this section shall preclude prosecution of a peace officer or employee of a police department or sheriff's department under any other provision of the law. And, nothing in this section shall be construed as limiting the statutory or common-law rights of any person for the purposes of any civil action or injunctive relief." C.R.S. § 16-3-405(6)(7).

47.    By the morning on or about August 15, 2015, Detention Facility officials, staff, and medical staff, named as Defendants in this case, were all aware of the Plaintiff's health and the substantial risk of harm they placed the Plaintiff in because the Director of Nurses, Jessica Isaacs, after receiving a number of calls from the Plaintiff's medical doctors, parents, criminal defense attorney hired by the Plaintiff's parents, and a jail administrator who was contacted by the Plaintiff's criminal attorney; Registered Nurse, Jessica Isaacs, entered Ms. Barry's cell at approximately 10am screaming obscenities at the Plaintiff about the number of calls she received to ensure that the Plaintiff had received her medication and request Ms. Barry be transferred to a Hospital due to symptoms of seizures, and esophageal swelling, which Ms. Barry was able to report to her

brother by telephone in a very brief conversation the morning of August 15, 2015, in additional to numerous Detention Facility Staff Members, and Medical Staff who were already notified of the Plaintiff's complicated and currently, severe medical issues which placed the Plaintiff at an extremely high risk of emergent medical complications that were clearly beyond the scope of the jails staff, and medical staff knowledge and abilities to even recognize..

During the volatile verbal attack by Nurse Isaacs against the Plaintiff; Nurse Isaacs promised the Plaintiff that she would not get any of her medications nor would she even be allowed out of her cell, under any circumstance, as punishment for the Plaintiff's action of contacting her brother by telephone and asking him for help because Ms. Barry had been denied her Medications by Jody Ramos, Jessica Isaacs, and Sophia Nix, despite numerous requests. Director of Nurses, Jessica Isaacs, became so unhinged toward the Plaintiff, who was seriously ill and barely able to speak, that the Detention Facility Guard on Duty had to raise his voice to Isaacs a number of times to get her out of the Plaintiff's cell.

It was clear by the Detention Facility KPod guard's behavior during Nurse Isaacs Verbal Attack and Threatening of Ms. Barry that the behavior of Nurse Jessica Isaacs was not an uncommon or unexpected response to Nurse Isaacs receiving calls from inmate's medical doctors, families, or even her superiors, including medical doctors available by telephone to the Nursing staff telling Nurse Isaacs what she needed to do and/or how to treat a patient in the jail.

Nurse Isaacs intentionally made a decision to disregard the orders of the

Detention Facility Medical Doctors, who were misinformed about the Plaintiff's medical conditions, and the request for medications, medical assistance, and for the Plaintiff to be transferred to a hospital by the Plaintiff's outside medical doctors, family, and the Plaintiff, despite a recognizable need for the Plaintiff to obtain medical care of a higher level than Nurse Isaacs could provide, and was willing to provide to the Plaintiff.

48.     Following this encounter with Nurse Isaacs, Ms. Barry was denied her medications by all medical staff and guards except for the night nurse on duty when Nurse Isaacs was not on duty. Stephanie Canton was the night nurse on duty who had contact with the Plaintiff. She gave the Plaintiff a couple of her medications that she was able to get an alleged 3rd party unidentified medical doctor on call for the nights to approve. Nurse Canton specifically told the Plaintiff that Nurse Isaacs, Director of Nurses at the Douglas County Detention Facility, had ordered medical staff she supervises, including; Kari Smith, Rachel Zeldenrust, Sophia Nix, Jody Ramos, Keshia Lorquet, Kari Smith, herself, and the guards on duty for the Kpod, which the Plaintiff was placed in to not give the Plaintiff any medication and to not approve any hospital transfers. After Nurse Canton informed the Plaintiff of this information she requested the Plaintiff to not tell any of the staff that she gave me any of my medication, and if the Plaintiff agreed, Nurse Canton was hoping to be able to provide the Plaintiff with the remainder of her medications, specifically those to control Ms. Barry's intracranial pressures, and the Effexor XR; with the Effexor XR being the only medication Ms. Barry took that would/could potentially cause withdrawal side

effects; and knowing the importance to Ms. Barry's health and to avoid further complications from abruptly stopping medications imperative to the Plaintiff's health and well-being.

Despite Canton's efforts to help Ms. Barry, Ms. Barry never received the medications that were crucial to her well-being and taken to reduce the risk of serious harm. And the medications actually provided to the Plaintiff by Canton were not documented, even though Canton made notations of the Plaintiff's precise low oxygen saturation levels, tachardia, seizures, etc. against instructions given to her by Jessica Isaacs. Additionally, Nurse Canton failed in her duty as a registered nurse in the State of Colorado, and as the Supervising LPN from 6pm to 6am to provide the patients/inmates under her care with the Standards of Care set forth by the State of Colorado, and The National Commission on Correctional Health Care's Standards for Health Services which set forth standards of care far above those that were given to Ms. Barry.

Shortly after Ms. Barry's 75-hour incarceration period, Stephanie Canton was dismissed by Correct Care Solutions, LLC for failing to follow instructions given by her superiors, Jessica Isaacs, Director of Nurses and Nurse Stevies, Assistant Director of Nurses of the Douglas County Detentions Facility.

49.     The following day on or about August 16, 2015, Ms. Barry, requested Nurse Isaacs during a vital check for clean underwear and bedding because the Plaintiff had lost control of her bladder due to a seizure. Nurse Isaacs, and the guard on duty both refused the Plaintiff's request and told her that if she wanted clean underwear and bedding she could wash them in the toilet located in her cell

using the small bar of soap she was given to bath with upon being checked into

the Detention Facility or that she could purchase new underwear by Tuesday

using the computer outside the Plaintiff's cell, which she had been denied access

too after making request for emergent medical care by medical doctors on, and the

underwear she purchased would be delivered the next Sunday, 7 days later.

50.     Later in the day on August 16, 2015, around 1pm, the Plaintiff began

having airway swelling and difficulty breathing when not at an angle. Ms. Barry

called the guard a number of times via a button linked to a speaker in the cell of

the Plaintiff. The guard supervising the K-Pod took approximately 15 minutes to

respond the Ms. Barry's initial request for emergency assistance.

Approximately 1 hour later, Sophia Nix, entered the Plaintiff's pod and

cell, unaccompanied, to check the Plaintiff's vitals. The Plaintiff reported to

Sophia Nix difficulty breathing at an angle, airway and esophageal swelling,

continuing dystonic movements consistent with seizure activity, and begged for

Nix to help her as she felt like she had a pulmonary embolism and was scared she

was going to die. Ms. Barry also told Sophia Nix at this time that she was unable

to keep any food down since being incarcerated and was now having difficulty

swallowing the limited amount of sugar water that was being provided to the

Plaintiff (approximately 18 ounces seven times in the approximate 75 hours of

incarceration). The Plaintiff's oxygen saturation levels at this time was 81.

Anything under 90 is considered dangerous and requires supplemental oxygen be

given to the Patient, in addition to finding the source causing the low oxygen

saturation levels. Sophia Nix left the Plaintiff's cell without commenting other

than stating that she would speak with Nurse Isaacs and be back to check on the Plaintiff shortly after speaking with Supervising Nurse Isaacs about what to do and a possible transfer to the Hospital for medical care.

An hour later, Sophia Nix returned to Ms. Barry's cell where she noted a declining oxygen saturation level, now in the low 70's and a very low ability to breathe through the Plaintiff's mouth, meaning the limited oxygen the Plaintiff was receiving was through breathing through her nose because Ms. Barry's throat was so swollen. Sophia Nix contacted Dr. Moser by telephone to ask permission to provide the Plaintiff with her albuterol inhaler at this time, but failed to ask for supplemental oxygen, Dr. Moser to come examine the Plaintiff, or a transfer for the Plaintiff to a Hospital. A combination of the Plaintiff's symptoms including difficulty breathing at an angle, chest pain, combined with the rapid declining oxygen saturation level, tachardia, and altered levels of consciousness, the Plaintiff should have been taken to the emergency room where she would have been provided at the level of care that she unquestionably needed, and at minimum be checked for a pulmonary embolism, and/or stroke and/or heart attack.

Dr. Moser, having no medical history of the Plaintiff, ordered Sophia Nix to bring Ms. Barry to medical and be given a breathing treatment. Sophia Nix, LPN, went back to Ms. Barry's cell and asked the guard on duty to assist her in assisting the Plaintiff to Medical due to the weakened state of the Plaintiff, who by this time was falling in and out of consciousness due to her severely diminished oxygen saturation level notated at the time to be 61, in addition to

experiencing worsening edema. Instead of assisting Sophia Nix, the Guard on Duty contacted Jessica Isaacs who then instructed Sophia Nix to call two deputies from booking to cuff and move the Plaintiff to Medical.

During the time preceding the Deputies arrival to the Plaintiff's cell, the Plaintiff was in and out of consciousness, and nobody in the Detention Facility attempted to check on her welfare or provide her with any medical assistance. Approximately 3.5 hours following the Plaintiff's first call for help due to airway swelling and difficulty breathing when not at an angle, two Deputies came into Ms. Barry's cell, cuffed her at her ankles and feet, then tying her wrist to her ankle cuffs using a heavy chain and proceeded to escort the Plaintiff to Medical. Because of the Plaintiff's altered level of consciousness, dizziness, pain, and difficulty functioning overall, the guards escorting Ms. Barry to medical instructed her to walk against the wall while one of them assisted her in walking the short distance to medical.

Upon Ms. Barry's arrival to Medical, Nurse Isaacs was sitting at a desk in Medical and made it very clear to the Deputies, Sophia Nix, and the Plaintiff that she was extremely unhappy that Ms. Barry was brought to medical and receiving any medical treatment. In fact, Nurse Isaacs went to the extent of claiming in a number of versions of the five different versions obtained of the Plaintiff's medical records that the Plaintiff "appeared to be faking it". However, Isaacs statement of the Plaintiff "faking it" was not backed by Sophia Nix, Keshia Lorquest, Kari Smith, or Rachel Zeldenrust, or Stephanie Canton who all had been working during the time of Ms. Barry's incarceration, and all who had

contact with Ms. Barry at least one or more times during Ms. Barry's incarceration, nor any one of the guards on duty. Rather, Nurse Isaacs claim that the Plaintiff appeared to be "faking it" was agreed upon by her Assistant, "Nurse Stevies", the Assistant Director of Nurses at the Detention Facility, who did not work at any time the Plaintiff was incarcerated, and is not currently, nor ever has been licensed as a Nurse in the State of Colorado, which was confirmed by DORA's Director of Nursing Licensure.

51.     Following the breathing treatment given to the Plaintiff by Nix in Medical, the Plaintiff reported having even a harder time breathing, and reported worsening chest pain to Nix and an overall feeling of sick and altered consciousness. Despite the Plaintiff's complaints, Isaacs instructed Nix to ignore Ms. Barry and have her taken back to her cell.

52.     The Plaintiff, Emily Barry, was the victim of Douglas County jailers who, failed to provide her with access to medical care to treat her serious medical conditions resulting is serious permanent damage to the Plaintiff causing full and complete disability, in addition to a host of other medical issues. The Plaintiff now has to have weekly IVIG Infusions at home, along with frequent lab draws done at home. She has also been forced to travel out of the State of Colorado on a regular basis to receive expert care at the Plaintiff's parent's own costs. Additionally, the plaintiff has had to undergo and continues to undergo numerous procedures, surgeries, and hospitalizations. She has currently surpassed the expected survival time given to her in May of 2016, but remains to be a financial and physical burden on her parents who provide 100% of the Plaintiff's care,

financially and physically. The Plaintiff's parents have been forced to take

countless days off work to transport their daughter to medical appointments,

travel out of state with her to see medical doctors, care for her when her condition

worsens, stay in the hospital with her out of fear that she will not receive proper

medical care, which was derived solely from the lack of medical care provided to

their daughter while incarcerated at the Douglas Detention Facility; and take care

of the Plaintiff's pets, finances, and general care like laundry, assisting in the

Plaintiff's grooming, etc.

## SUMMARY OF FACTUAL ALLEGATIONS
## COMMON TO ALL CLAIMS FOR RELIEF

53.     On August 14, 2015 through August 17, 2017, Ms. Barry was in the

custody of the Douglas County Sheriff and the Detention Facility.

54.     Ms. Barry repeatedly complained to jail officials that she had serious

medical conditions and needed medication and treatment including Ms. Barry's

blood pressure and pulse rates that they did release, combined with esophageal

swelling, increased intracranial pressure resulting in seizures and then having

difficulty breathing except at an angle. It is very likely that she had a pulmonary

emboli and sustained damage to her brain from lack of oxygen, seizures and/or

the suspected mini stroke diagnosed by the Plaintiff's neurologists in October

2015, with the radiologists placing the age of the mini stroke the Plaintiff endured

around the time of her incarceration. The radiologists reading the Plaintiff's scans

did not know the Plaintiff was incarcerated or when her specific symptoms began when giving his opinion of when the suspected mini stroke occurred. The Plaintiff subsequent her incarceration was treated from a pulmonary embolism, and has been hospitalized with additional pulmonary embolisms since then now requiring Ms. Barry to be on blood thinners for the remainder of her life.

55.     Ms. Barry's intracranial pressures around her spinal cord didn't decrease until end of 2016, and the high pressures is why she kept passing out which resulted in numerous broken bones, ligament and nerve damage. Ms. Barry's intracranial pressures are regulated by Klonopin and Alprazolam. The Jail not only refused those medications, but also refused to give her any jail approved medication or even call the doctor on call to find out alternative treatments (even though legally they are mandated to have a doctor on site 24/7/365). The damage caused to brain during that time likely damaged the part of the brain that signals the increased production in blood to keep up with the amount of blood that leaks out from her vessels. Her blood counts went down after incarceration and have never been high again. Ms. Barry needs high blood counts to live. Without the excess blood and excessive blood production her organs do not receive the necessary blood flow to function properly, resulting in the disease becoming terminal from organ function slowly declining, which has been happening. Additionally, damage to the Plaintiff's brain caused from the seizures and increased intracranial pressure which were completely preventable have place the Plaintiff in a situation of permanent disability, which is associated with constant severe pain and suffering. The damage caused to the brain can potentially be

repaired with a very risky surgery which has an overall success rate of only 30-40% and requires a minimum 12- month recovery period. The plaintiff must travel out of the state of Colorado for the surgery as there is no neuro-specialists in Colorado who specialize in this surgery causing an unnecessary financial hardship for Ms. Barry's family, in addition to major risky neurosurgery.

56. When Ms. Barry was checked into the Jail they booked 11 medications into evidence which were: Effexor XR, Levocetirizine, Levothyroxine, Singulair, Adderall XR, Adderall, Bumetanide, Xyzal, Clonapen, Alprazolam, and her albuterol inhaler. During her incarceration she was not given: Alprazolam, Clonapen, Adderall XR, Adderall, Albuterol Inhaler, Effexor XR, Bumetanide, and Xyzal.

57. Deputy Carlson and Odum's reports reflect a similar desire to brush off Ms. Barry's medical issues as not being a big issue despite her swelling being so severe that one could barely see her eyes, mouth, or other facial features.

58. Jail officials, including Defendants Captain Kevin Duffy, and Defendant, Correct Care Solutions, LLC and it employees, agents, and contractors in addition to the other Jail Defendants, were deliberately indifferent to Ms. Barry's serious, obvious medical needs. Upon request for the records from the Jail, they also produced Emily Barry's records from a visit to Littleton Adventist Hospital on June 25, 2015, where all of these medical issues were identified, so the facility knew that she had serious medical issues and decided to disregard them.

59. Defendants' indifference to Ms. Barry's serious medical needs is evidenced by both Deputy Odum and Glassburner's incident reports of August 14, 2015 in

which they wrote, "Emily has some serious mental and medical issues going on" and "She is having a lot of medical issues." Despite the Plaintiff's medical inability to leave her residence; in addition to her posing no threat to others nor herself, she was still taken into custody, being placed into handcuffs by Deputy Carlson inside her home. She was then taken to Castle Rock Adventist Hospital in Castle Rock, Colorado, however, she never saw a nurse practitioner or a physician and someone forged her signature on the medical records to clear her for transport to the Douglas County Detention Facility. Fully aware of her serious medical condition the Sherriff's Department by and through its deputies and defendants; and Castle Rock Adventist Hospital, Sara Michael (PA-C), Eugene Eby, MD, Jennifer Glenn, RN took Ms. Barry to jail.

60. Jail officials, including the nurses and doctors, delayed and denied Ms. Barry access to adequate medical care to treat what obviously was a "serious medical condition" within the meaning of Colorado criminal law. Jail officials unquestionably could and should have provided Ms. Barry with adequate medical care on August 14, 2015 and in the subsequent days.

61. On August 15, 2015, Officer Parkinson, knowingly violated the Colorado State Law and performed an unlawful strip search of the Plaintiff; which is to only be conducted by a medical doctor or nurse practioner, in order to complete the booking process of the Plaintiff without incurring the costs of hiring the correct medical professional to complete the strip search of Ms. Barry.

62. The nursing staff at the Detention Center failed in their duties by acting outside the scope of their individual capacities in order to meet the standards of

care set by her employer, the Douglas County Sheriff's Office, and the
Detention's Facility, which discourages contacting medical doctors on call for
approvals, giving patients costly medications, and highly discourages transporting
any patient/inmate to the hospital for a higher level of medical care than Nurse
Isaacs and her supervisees can care for giving their limited training.

63.      Based on information and belief, Nurse Isaacs did not receive the
appropriate training, supervision and/or oversight, or there was an
unconstitutional policy or custom that required or allowed nurses to perform
inadequate patient assessments and treatment without contacting a physician.

64.      The arrest of Emily Barry by Deputy Carlson on August 14, 2015, was
without warrant and exigent circumstances. The arrest may have been affected
under what appears to be probable cause; however, the case narratives submitted
by Deputy Carlson, Deputy Glassburner, and Deputy Odum to establish probable
cause for arrest contain numerous willful and wanton falsified statements by the
Deputies which can be proved by residential video surveillance footage. The
misconduct by the Douglas County Sheriff's Office in this case resulted in an
unlawful arrest of the defendant, and false charges against the defendant for the
actions she was forced to take in order to protect herself, and her
residence/property. Deputy Carlson failed in his duties to ensure Ms. Barry was
medically cleared by a medical doctor or other qualified and appropriate medical
personnel before being brought to the detention facility and booked into custody
on August 14, 2015.

65.      Medical records of Ms. Barry's medical clearance were altered, and a

signature of Ms. Barry was forged after the date of her arrest on August 14, 2015. On August 15, 2015, at approximately 9am, Ms. Barry was strip searched at the Jail, in violation with the law, which requires any strip searched to be done by a nurse or physician, and probable cause to exist for the defendant to have weapons and/or drugs on or in her body. Ms. Barry was INTENTIONALLY denied her medication by the medical staff despite numerous requests from Ms. Barry, calls from Ms. Barry's supervising physician to the head nurse on duty, calls from Ms. Barry's parents to the head nurse on duty, and calls from Ms. Barry's criminal attorney, Chris Decker, to a member of the jail administration. This resulted in extensive permanent medical trauma to Ms. Barry. Head nurse on duty during the daytime, Jessica Isaacs, intentionally disregarded medical orders given to her by the Medical Doctor on call regarding Ms. Barry's medical treatment.

66.     Defendants continued to be deliberately indifferent to Ms. Barry's serious, obvious medical needs by refusing Ms. Barry the help she so desperately requested. Ms. Barry was at the mercy of the Jail.

67.     As a result of Defendants', Captain Kevin Duffy and Douglas County Facility, delay and denial of her access to adequate medical care, Ms. Barry has suffered severe physical and emotional injuries, including affected other substantial health problems including the aggravation and worsening of pre-existing serious medical conditions.

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Eighth and Fourteenth Amendment Violations
### Failure to Provide Medical Care and Treatment
### (Against All Defendants)

68. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

69. At all relevant times to this Complaint, Defendants were acting under color of state law in their actions, and inactions, at all times relevant to this action, in their capacities as Douglas County Sheriff's office, Douglas County Detention Facility and Correct Care Solutions, LLC.

70. At all relevant times to this Complaint, Plaintiff had a clearly established constitutional right under the Eighth and Fourteenth Amendments to the United States Constitution to access to adequate medical care while in the custody of the Douglas County Detention Facility.

71. At all times relevant to this Complaint, any reasonable law enforcement officer knew or should have known of this clearly established right.

72. Defendants' actions and inactions, as described herein, deprived Plaintiff of her constitutional right to access to adequate medical care.

73. Defendants knew or should have known of Ms. Barry's serious, obvious medical needs resulting from the history provided by Ms. Barry, Littleton Adventist Hospital and calls from at least one of Ms. Barry's treating doctors.

74. Defendants' deliberate decisions to delay her and/or deny Ms. Barry's access to adequate medical care, despite knowledge of her serious, obvious medical needs, amounts to deliberate indifference and willful and wanton disregard to the substantial risks of serious harm to Plaintiff, depriving Plaintiff of life's necessities, and failing to provide Plaintiff humane conditions of confinement, in violation of Plaintiff's Eighth Amendment rights to be free from

cruel and unusual punishment and Fourteenth Amendment right to due process.

75.     Defendants knowingly, intentionally, willfully and maliciously disregarded the obvious serious risks of bodily injury and death to Plaintiff, failed to provide humane conditions of confinement, deprived Plaintiff of life's necessities, and violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment and Fourteenth Amendment right to due process, resulting in substantial harm to Plaintiff.

76.     The acts or omissions of Defendants were the legal and proximate cause of Plaintiff's damages in that she suffered severe physical and emotional injury as a result of Defendants' delay and/or denial of her access to adequate medical care.

77.     Defendants' conduct in violating Plaintiffs' rights as described herein shocks the conscience and is intolerable to society's standards of fundamental fairness.

78.     The acts and omissions of Defendants were engaged in pursuant to the custom, policy, and practice of Douglas County, the Sheriff and the Jail.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Failure to Train or Supervise**
**(Against Defendants Spurlock and Duffy)**

79.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

80.     At all relevant times, Defendant Sheriff Tony G. Spurlock was an official policymaker responsible for establishing final policy with respect to Douglas County, Douglas County Sherriff and its Jail. In this capacity, Defendant Captain Kevin Duffy was responsible for the adequate training and supervision of his staff

regarding maintaining the health and safety of all inmates at the Jail.

81.    At all relevant times, Defendants Sheriff Tony G. Spurlock and Captain Kevin Duffy acted in supervisory capacities as Sheriff and Captain, respectively, at the Douglas County Sheriff's Office and The Jail, responsible for the adequate training and supervision of their staff regarding maintaining the health and safety of all inmates at the Jail.

82.    Defendants Sheriff Tony G. Spurlock and Captain Kevin Duffy failed to properly train and supervise their employees with regard to maintaining the health and safety of all inmates at the Jail. Defendants Sheriff Tony G. Spurlock and Captain Kevin Duffy tolerated a custom, policy, and practice of unconstitutional failure to maintain the health and safety of all inmates at the Jail.

83.    Defendants Sheriff Tony G. Spurlock and Captain Kevin Duffy knew, or should have known, that their employees would fail to maintain the health and safety of all inmates at the Jail, violating inmates' constitutional rights.

84.    Defendants Sheriff Tony G. Spurlock and Captain Kevin Duffy were deliberately indifferent to the constitutional rights of inmates, knowing that dangerous and potentially fatal consequences could be suffered by such individuals (including Ms. Barry) by failing to properly train and supervise their employees with regard to maintaining the health and safety of all inmates at the Jail. Defendants Sheriff Tony G. Spurlock and Captain Kevin Duffy could have and should have pursued reasonable methods for the training and supervising of such employees with regard to maintaining the health and safety of all inmates at the Jail, but failed to do so.

85. The inadequate training and supervision provided by Defendants Douglas County, Sheriff Tony G. Spurlock and Captain Kevin Duffy resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to it.

86. In light of the duties and responsibilities of the Sheriff's and Jail officials, including all Defendants here, the need for specialized training and supervision is so obvious, and the inadequacy of the training and/or supervision is so likely to result in the violation of constitutional rights such as those described herein, that Defendants Sheriff Tony G. Spurlock and Captain Kevin Duffy are liable for their failure to so train and to appropriately supervise their employees.

87. Defendants Douglas County Sheriff's Office and Douglas County Detention Facility's policies, customs, or practices in failing to properly train and supervise their employees were the moving force and proximate cause of the violation to Ms. Barry's constitutional rights.

88. An affirmative link exists between the deprivation of Plaintiff's constitutional rights and Defendants Sheriff Tony G. Spurlock and Captain Kevin Duffy's personal participation, exercise of control or direction, or failure to supervise.

89. The acts or omissions of Defendants Douglas County Sheriff's Office and Douglas County Detention Facility caused Ms. Barry damages in that she suffered extreme physical and mental pain during and after her incarceration, during the period in which her access to adequate medical care was delayed and/or denied by Defendants.

90.     CCS and/or Douglas County ("Defendants") ordered or acquiesced in allowing nurses, including but not limited to Nurse Jody Ramos to perform a constitutionally deficient initial health assessment. Nurses staffed at the facility did not receive the appropriate training, supervision, and/or oversight, ot there was an unconstitutional policy or custom requiring and/or acquiescing in allowing nurses to conduct constitutionally inadequate intake examinations that lead to the denial of necessary medical treatment for serious medical needs. Defendants have a policy or custom of routinely denying detainees, including Ms. Barry, access to medical treatment by qualified medical providers, having nurses practice outside their scope of their licenses by failing to fulfill their gatekeeper roles, and denying detainees necessary and life-saving medications by a qualified medical provider, all of which was the moving force in causing Ms. Barry's injuries and damages. *Monell v. Department of Social Services,* 436 U.S.: 658, 694 (1978); *Dubbs v. Head Start, Inc.,* 336 F .3d 1194; 1216 (10th Cir. 2003)

91.     The actions of Defendants, as described herein, deprived Ms. Barry of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused her other damages.

## **REQUEST FOR RELIEF**

The Plaintiff requests the following relief:

This Court enter judgment in her favor and against each of the Defendants, and award her all relief allowed by law, including but not limited to the following:

(a)     Appropriate relief at law and equity;

(b)     Declaratory relief and other appropriate equitable relief;

(c)     Economic losses on all claims as allowed by law;

(d)     Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, loss of companionship and association with family members, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f)     Attorney's fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(g)     Pre- and post-judgment interest at the appropriate lawful rate; and

(h)     Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 27th day of November, 2017.

_____
(Plaintiff's Original Signature)

 9633 Kalamere Ct.
(Street Address)

Highlands Ranch, CO 80126
(City, State, ZIP)

 239-785-5752
(Telephone Number)